IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| RAY B. ALLEN,<br><br>    Plaintiff,<br><br>vs.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>    Defendant. | No. C07-4004-PAZ<br><br>**MEMORANDUM OPINION<br>AND ORDER** |

      This matter is before the court on judicial review of the defendant's final decision denying the plaintiff's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* The plaintiff Ray B. Allen filed his application on October 25, 2004, alleging his disability began on July 18, 2003. Allen claims he is disabled due to bilateral sacroiliitis, chronic low back pain, high blood pressure, lumbar spinal stenosis, childhood polio, and bilateral L4 partial hemilaminectomies to remove extruded discs. (R. 67) Allen's application was denied initially and on reconsideration. He requested a hearing, and a hearing was held on May 16, 2006, before ALJ Robert Maxwell. Allen was represented at the hearing by attorney David Scott. Allen testified at the hearing, and Vocational Expert ("VE") Tom Audet also testified. On July 13, 2006, the ALJ held that although Allen cannot return to any of his past work, he nevertheless is able to perform other work that exists in significant numbers in the national economy. The ALJ therefore held Allen is not disabled. Allen appealed the ALJ's decision, and on November 20, 2006, the Appeals Council of the Social Security Administration denied his request for review, making the ALJ's decision the final decision of the Commissioner.

Allen filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. On February 14, 2007, with the parties' consent, Judge Mark W. Bennett transferred the case to the undersigned for final disposition and entry of judgment. The parties have briefed the issues, and the matter is now fully submitted and ready for review.

The issue before the court is whether the ALJ applied the correct legal standards, and whether his factual findings are supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citations omitted). In this deferential review, the court considers the record in its entirety to determine whether a reasonable mind would find the evidence adequate to support the Commissioner's conclusion. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citations omitted); *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006).

Allen was born in 1959. He is single, and he lives alone on a rural acreage near Spencer, Iowa. He has a high school education. He had polio as a child that affected his left leg to some degree. He worked for 25 years at Eaton Corporation, an industrial manufacturer that, among other things, manufactures hydrostatic transmissions and transaxles. For the first twenty years or so, Allen's job required him to lift significant amounts of weight repeatedly throughout the day. For the last five or six years of his employment, he did production testing on a hydraulic hydrostatic unit that goes on a combine. The position required only light lifting, but it also required a lot of pushing and pulling to hook up hydraulic lines.

Allen began having problems with back pain in about 1998. He received injections in his back which gave him only short-term relief. An MRI from December 5, 1998, showed a large disc extrusion at L4-5 leading to significant stenosis, slightly more prominent on the left, and a smaller disc extrusion displacing the S1 nerve root. On July 14, 2003, Allen saw his family doctor with complaints of low back pain, occasionally radiating down his left leg. The doctor prescribed Flexeril and Vioxx, with follow-up in

one week. On July 19, 2003, Allen attended a baseball game in Minneapolis, Minnesota. The ride to and from Minneapolis exacerbated his back and leg pain so much that he never returned to work. He saw his family doctor, Nathaniel Meyer, M.D., on July 22, 2003, but the doctor's notes in the record are illegible. On July 23, 2003, he saw Dr. Meyer again and stated his back was "somewhat better," but his leg continued to be "quite bothersome." The doctor prescribed a Medrol Dosepak, Flexeril, and Naprosyn. On July 28, 2003, Allen reported his back pain was "essentially gone," and he was having no pain down his left leg. (R. 199)

By August 4, 2003, Allen's back and leg pain had returned, and he was experiencing numbness in his left leg. He was treated with an epidural flood, which helped "slightly." After the procedure, he was having pain down both legs, but somewhat less than before the epidural flood. He was scheduled for two more epidural floods. Allen saw Dr. Meyer on September 5, 2003, complaining that although his back pain had improved initially after the epidural floods, it had worsened again. The doctor ordered an MRI exam, which took place on September 8, 2003. The MRI showed no significant change from Allen's December 1998 MRI.

Dr. Meyer referred Allen to Michael R. Puumala, M.D., a neurosurgeon, for evaluation. Dr. Puumala saw Allen on October 6, 2003. He noted Allen's pain had not subsided during a trial of conservative treatment, and he therefore considered surgical approaches. He recommended the most limited surgical option, consisting of removing the disc fragments with bilateral partial hemilaminectomy at L4 and partial hemilaminectomy at L5 on the left, noting a fusion could be required in the future. Dr. Puumala opined Allen likely would not be able to return to his past occupation after the surgery, noting Allen's work was "very difficult on one's back." Allen elected to go forward with the surgery, and Dr. Puumala performed the surgery on October 29, 2003. Two weeks after surgery, Allen reported some continuing numbness in his left leg, but it was better

than before the surgery and he had no leg pain. The doctor observed that Allen was "still somewhat favoring the left leg when he walks." (R. 127) Six weeks after surgery, Allen continued to report no leg pain but he still had "a fair amount of muscular back pain." (R. 126) He also continued to have some numbness in his left leg. He was released to lift up to twenty pounds and perform "easy activities as tolerated," with no heavy lifting, bending, or twisting. (*Id.*)

Three months after surgery, on February 5, 2004, Allen reported that his leg symptoms had improved, but he still had "low back pain and pain into the left buttocks going under towards the groin." (R. 125) The pain was better in the morning, but worse later in the day. He took occasional hydrocodone for the pain. The doctor noted Allen's gait was improved, but he still was unable to walk on his heels or toes on the left and his left leg was atrophied. The doctor found it difficult to diagnose Allen's back pain. He suggested the pain might relate to "residual radiculopathy, mechanical problems due to [the] atrophy which are either muscular or skeletal, or even perhaps referred from abdominal process." (*Id.*) Although Dr. Puumala did not impose further work restrictions from Allen's surgery, the doctor did indicate Allen should not return to work yet due to his ongoing discomfort.[1] He referred Allen to a physical medicine and rehabilitation specialist for evaluation and a determination regarding further treatment and work restrictions. Allen's current medications were listed as Norvasc, Diazide, Vioxx, and Flexeril.

Allen saw Jonathan Stone, M.D. on February 24, 2004, for evaluation of his low back and bilateral gluteal pain. Allen described the pain as "burning and throbbing, constantly present, but . . . worsening as the day goes on." (R. 139) He indicated the pain was exacerbated by prolonged sitting and standing. He also continued to have some

---

[1]The Commissioner states, in his brief, that "[o]n February 5, 2004, Dr. Puumala, opined that [Allen] should return to work." (Doc. No. 11 at 2) This statement is incorrect. The doctor stated, "I do not feel that the patient should go back to work at this point." (R. 125)

4

numbness of his left leg below the knee, and he complained of "pain in his back, feet, hands, hips, legs, and shoulders." (R. 140)  At the time of this exam, Allen was 5'6" tall and weighed about 269 pounds, which the doctor indicated was "obviously overweight." (*Id.*)  The doctor noted Allen had "obvious atrophy with limited motion of the lower left leg with obvious limitations in motion around the ankle." (*Id.*)  His forward flexion was mildly limited, and lateral flexion to the left increased his pain slightly.  Dr. Stone started Allen on Zanaflex to see if it would help Allen sleep, and he prescribed physical therapy three times weekly for two weeks.

Allen did not go to physical therapy consistently, only attending about once per week.  He saw Dr. Stone on April 1, 2004, and reported his pain was no better.  The pain was worse when sitting or standing, but he obtained some relief from lying down on his side.  Upon examination, Allen had positive Patrick's maneuver on the left; i.e., he experienced pain upon rotation, flexion, and abduction of the hip joint.  He had positive Gaenslen's test bilaterally, left slightly more than right.[2]  Both of these tests had been negative at Allen's February 24, 2004, examination.  The doctor diagnosed Allen with chronic low back pain, possible sacroiliitis, and obesity.  He stressed that it was important for Allen to be compliant with his physical therapy.  On April 16, 2004, Allen received injections in his sacroiliac joints.  The injections provided him with significant pain relief beginning about two days after the injections.  On April 22, 2004, he rated his pain at a 2/10 to 3/10, as opposed to the 4/10 to 5/10 it had been previously.  He had been more active at home and was very pleased with the results.  However, on the drive to the doctor's office, he had noticed some flare in his pain, and he noted sitting made his pain worse.  On examination, he had negative Patrick's maneuvers bilaterally, but still a slightly positive Gaenslen's test on the right.  No new treatment was prescribed, but Dr. Stone

---

[2]Gaenslen's test detects musculoskeletal abnormalities of the sacroiliac joint.

noted Allen's blood pressure had been elevated at his visits, and he recommended Allen see Dr. Meyer for follow-up of his hypertension.

On June 14, 2004, Allen saw Dr. Stone with complaints of increasing pain from his low back, radiating down his buttocks. He stated the pain was of a burning, throbbing nature, but it was not as constant as before his injections. He had positive Patrick's maneuvers bilaterally, and positive Gaenslen's on the right. Allen indicated he was not interested in physical therapy because he felt it made his pain worse. The doctor diagnosed Allen with bilateral sacral ileitis with exacerbation, chronic low back pain, and hypertension. He prescribed an increased dose of Depo-Medrol, and scheduled Allen for another round of injections, which were administered on June 23, 2004. Allen saw the doctor again on July 7, 2004, reporting significant improvement in his pain since the injections. He continued to have some discomfort in his hips, but it was much better than before. He stated his pain was increased by driving, standing, and sitting. Patrick's maneuvers and Gaenslen's test both were negative. Allen had another round of injections on November 3, 2004, again receiving significant short-term pain relief.

On January 4, 2005, Dennis A. Weis, M.D. reviewed the record and completed a Physical Residual Functional Capacity Assessment form. He opined Allen could lift/carry up to twenty pounds occasionally and ten pounds frequently; stand and/or walk for up to two hours in a normal workday; sit for up to six hours in the workday; push/pull without limitation; and perform all postural activities occasionally.

On January 19, 2005, Allen was seen by an independent medical, who rated Allen with a 13% whole person permanent partial impairment as a result of his lumbar problems. He opined that Allen could perform light work requiring lifting of no more than twenty pounds occasionally, ten pounds frequently, and minimal amounts constantly, with only occasional bending, twisting, and squatting. The doctor was "not specifically asked to make comment on limitations concerning [Allen's] medical problems outside of his back

6

pain[, including, for example,] . . . his blood pressure, diabetes or postpolio syndrome." (R. 211)

Allen saw Dr. Stone on February 1, 2005, with complaints of bilateral hip pain, radiating down his legs somewhat to about the knees. The pain worsened with prolonged standing or sitting, but it improved somewhat if he changed positions. He had bilateral positive Patrick's and Gaenslen's maneuvers. He was diagnosed with bilateral sacroiliitis, obesity, and hypertension. The doctor directed Allen to continue exercising, noting Allen had not been "real consistent" with his exercises. Allen had another set of injections on March 3 and July 20, 2005. He sw Dr. Stone for follow-up on October 24, 2005, and reported that he was doing somewhat better. He rated his pain at 4-5/10, mostly in his low back and bilateral buttocks. He described the pain as "sort of burning in nature and constant." Pain was increased with activity or riding in a car, and was relieved by taking hydrocodone and lying down. Patrick's maneuver was positive on the left, negative on the right, and Gaenslen's was "equivocal bilaterally." (R. 224) He had limited range of motion of his lumbar spine. Dr. Stone directed Allen to continue using hydrocodone as needed for pain.

Allen received SI injections again on December 14, 2005, and April 26, 2006. He continued to obtain significant short-term relief from the injections, but his pain would return to previous levels within a few weeks.

Allen testified that his condition has remained basically unchanged since soon after his back surgery. Before each round of SI injections, he is bedridden, spending eighteen to twenty hours a day in bed. If he gets up and moves around, he experiences severe pain that he can alleviate only by lying on his side and trying not to move. He tries not to take pain medications during the day because they make him drowsy and prevent him from driving. He takes hydrocodone almost every day, usually after 6:00 p.m. He also takes Flexeril. He stated the medications help somewhat. According to Allen, he has to stop

7

taking his pain medications for a period of time prior to his SI injections to prevent any excessive bleeding, and he notices his pain is increased after he stops taking the medications.

Allen underwent a functional capacity evaluation ("FCE") on March 15, 2006, at Spencer Hospital. The evaluator found Allen could work at the sedentary level for an eight-hour day. Allen did not complete some of the testing due to pain complaints and the inability to assume test postures. Because he passed only 62% of the validity criteria, the results of the testing were considered to be "borderline invalid" and demonstrative of poor effort; however, "there were no overt signs of symptom exaggeration, so no conclusion [could] be drawn as to the reason for his poor effort. He did register a high pain profile which could be consistent with poor effort." (R. 277) Allen testified the evaluation lasted over three hours. He stated the evaluator told him to stop each activity as soon as he felt pain. On the day of the evaluation, he was having severe pain, so he stopped the testing activity early in the testing.

On April 16, 2006, Allen underwent another complete FCE in connection with his application for disability benefits. Allen rated his back pain level at 3/10, which he indicated was "tolerable." After he had been seated for ten minutes, he reported pain in his buttocks. Allen stated he could sit for up to two hours and stand for thirty minutes before he must change positions. The examiner noted Allen walked with "a limp with decreased weight bearing on the left." (R. 236) His limp was noted to be consistent throughout the evaluation. He could balance on his right leg for ten seconds, but only for one second on the left leg. His upper extremity strength and range of motion were found to be within normal limits. He had some deficit in his grip strength on the right, and slight deficits in pinch strength on both sides, but when compared with the normative population, these levels were deemed to be normal. He had decreased hip flexion at 4/5, no ability to squat, and the ability to kneel occasionally with support to return to standing.

The evaluator found Allen cannot perform any work requiring lifting from the floor. He can perform lifts from the knees, waist, shoulders, and overhead, but cannot carry. He should not work at a job that requires significant walking, and "he is not suited to work in areas of production work, assembly line work or any other job which requires fine coordination as a major aspect of the job." (R. 242) He can kneel for fifteen minutes, but would need support to return to a standing position. He can stand and sit frequently, but he would need to be able to change positions as needed. He can perform a static push/pull, as long as it does not require him to do so while walking. On May 10, 2006, Dr. Meyer reviewed the April 16, 2006, FCE, and concurred in the evaluator's conclusions.

The evaluator noted Allen was cooperative and gave a good effort, and his testing results were deemed to be valid. He also noted that he had pushed Allen beyond the degree of limitations Allen perceived he had. This is somewhat significant because Allen testified that the evaluation left him largely incapacitated for the next two weeks. He was able to get up, prepare meals and eat, and care for his bodily needs, but he was unable to do anything else but sleep, which he did for about twenty hours a day. In comparison with the previous FCE, in which Allen stopped each test when he felt pain, Allen stated the second FCE evaluator "didn't use pain as an issue so much unless it was very severe." Allen stated, "I gave it my all. . . . [H]e pushed me as hard as he could and I did it as hard as I could. And I knew I'd pay the price for it and I did. I took pain pills that night, and, like I said, was unable to do anything for two weeks until I went and had those injections." (R. 295)

Allen stated his pain level varies from day to day, and he cannot predict when it will worsen. Oftentimes, he is unable to leave his house due to pain and he spends most of his time lying down, but at other times, he would be able to work for an hour or two before the pain would become unbearable. For the most part, however, he becomes very uncomfortable if he sits for very long. He does not believe he could work at a job that

9

required him to sit for a total of six hours in a workday, or stand for two-thirds of a workday. He stated he might be able to work for two or three days, but then he would end up in bed. He stated he does well for a few weeks after each round of SI injections, but when the pain returns, he spends at least one full day per week in bed.

Allen does his own cooking, laundry, and house cleaning, although his mother and sister help with the household chores. He watches a lot of television and is able to follow the story line without difficulty. He generally takes a nap each day. He tries to walk every day, and he can walk up to a mile on a good day, but only a few hundred yards, at best, on a bad day. He hires someone to mow his lawn. He enjoys hunting and fishing and he does these activities occasionally, for a few hours at a time.

Allen received monthly disability payments of about $1,582 (net) from Eaton Corporation beginning in July 2003, and continuing through April 30, 2006. He stated his disability payments were terminated due to the results of the March 2006 FCE. Allen is appealing the termination of his benefits.

The ALJ asked VE Tom Audet four hypothetical questions, based on a person of Allen's age, education, and work experience. First, he asked the VE to consider a person with work-related limitations consistent with Allen's testimony. The VE stated the individual would not be able to work due to excessive absenteeism. Second, the ALJ asked the VE to consider a person with the limitations found by Dr. Weis from his January 2005 review of the record. The VE stated that individual would be unable to return to Allen's past work, but would be able to perform some light work, although not the full range of light work. The individual would require a job that allows for some change of position between sitting and standing. Examples of jobs the individual could perform include small products assembler, electrical assembler, and cashier II.

Third, ALJ asked the VE to consider the limitations found by the evaluator in Allen's April 2006 FCE. The VE stated the individual would be unable to return to

Allen's past work, but would be able to perform some light work such as "some counter clerk positions" that do not require any fine manipulation, or tanning salon attendant. Fourth, the ALJ asked the VE to consider the limitations estimated by the evaluator after the March 2006 FCE. The VE indicated the individual would not be able to return to Allen's past work, and also would not be able to perform any other work. He noted the first evaluator found Allen could not perform fine hand manipulation and he could reach only occasionally, which the VE indicated are "key features of sedentary, unskilled work." (R. 319)

The ALJ found Allen to have severe impairments including "a history of herniated nucleus pulposus at L4-5 and L5-S1 with subsequent development of left sciatica (status post surgical intervention including L4-5 and L5-S1 hemilaminectomy); bilateral sacroiliitis; and obesity[.]" (R. 13; citation omitted) He further found Allen to have non-severe impairments consisting of "hypertension, diabetes mellitus, carpal tunnel syndrome, and a history of left lower extremity postpolio syndrome." (R. 14) The ALJ found Allen's impairments, singly or in combination, do not meet the Listing requirements.

The ALJ assessed Allen's residual functional capacity as follows: "occasionally lift 40 pound[s] at knee height, 35 pounds at waist height, 20 pounds at shoulder height, and 20 pounds at overhead height; frequently lift 20 pounds at knee height, 17 pounds at waist height, 10 pounds at shoulder height, and 10 pounds at overhead height; frequently sit and/or stand, with the need to transition from one position to another as needed for pain; occasionally reach, bend, kneel with support to come to standing, and perform overhead activity; and never squat . . . [and] not suited to work that requires fine coordination as a major aspect of the job." (*Id.*)

The ALJ found Allen's subject complaints regarding the extent of his limitations not to be fully credible. He acknowledged that Allen suffers some pain and limitations from his impairments, but found that those impairments would not preclude all substantial

gainful activity. As justification for these finding the ALJ cited Allen's activities of daily living, and his ability to go hunting and fishing occasionally. He found Allen's reports to his doctor that his pain improved significantly for a period of time following each round of SI injections to be inconsistent with Allen's allegation that he spends a full day every couple of weeks in bed. The ALJ noted the independent medical examiner and Allen's doctors had opined he can perform some lifting and occasional postural activities, and generally he can perform light work. The ALJ specifically discounted the findings from the March 2006 FCE because of Allen's submaximal effort on the testing. He found the evaluator's conclusions to be based primarily on Allen's subjective pain complaints, rather than on objective test results. The ALJ relied, instead, on the findings from the April 2006 FCE, which indicate Allen can perform light work, noting that Allen's treating physician concurred in the conclusions of that FCE.

Based on these conclusions, the ALJ found Allen is unable to return to his past relevant work, but he retains the ability to perform less than the full range of light work. He relied on the VE's testimony in finding Allen is able to perform the requirements of occupations such as counter clerk and tanning salon attendant. He therefore found Allen not to be disabled.

Allen argues a "preponderance of the evidence" indicates he is incapable of working. (Doc. No. 10 at 6) As the Commissioner notes in his brief, "preponderance of the evidence" is not the appropriate standard of review. Rather, the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Page* 484 F.3d at 1042 ("Substantial evidence

is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion." Quoting *Haggard*, 175 F.3d at 594); *Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Allen argues the ALJ based his decision on Dr. Weis's paper review of the record, which was "completed before all relevant physical examinations and testing of [Allen] and the foundation for which is not clear in the record[.]" (Doc. No. 10 at 7) Allen further argues the ALJ afforded great weight to the VE's responses to the hypothetical questions, which Allen asserts "should not have been afforded greater weight than the conclusions which should have been drawn from [his] on-going medical care and his testimony about how he is able to get along and what he is able to do." (*Id.*) These arguments do not reflect the ALJ's decision. Although the ALJ considered Dr. Weis's opinions, he found Allen's residual functional capacity to be more restrictive than suggested by Dr. Weis. The ALJ's assessment of Allen's RFC is consistent with the findings from the April 2006 FCE, with which Allen's treating physician concurred. The ALJ afforded weight to the VE's response to the third hypothetical question, which considered the limitations Allen demonstrated in the April 2006 FCE.

The court finds it significant that Dr. Meyer concurred in the findings from the April 2006 FCE. The court further finds it significant that none of Allen's treating physicians ever indicated he could not or should not work. *See Young v. Apfel*, 221 F.3d 1065, 1069 (8th Cir. 2000) ("We find it significant that no physician who examined [the claimant] submitted a medical conclusion that [he] is disabled and unable to perform any type of work.") (citing *Brown v. Chater*, 87 F.3d 963, 964-65 (8th Cir. 1996)). These facts support the ALJ's finding that Allen's testimony was not credible regarding the effects the FCEs had on him.

Allen undoubtedly experiences pain that could make work uncomfortable for him. However, as the Eighth Circuit held in *Johnson v. Chater*, 108 F.3d 942, 947 (8th Cir.

1979), "the mere fact that working may cause pain or discomfort does not mandate a finding of disability." (Internal quotation marks, citation omitted.) Indeed, as workers age, it is likely the majority experience some degree of daily discomfort, whether physical or mental or both, related to the demands of their jobs. This does not render them disabled, as defined by the Social Security Act and its implementing regulations.

The court finds substantial evidence in the record supports the Commissioner's decision that Allen is not disabled. Accordingly, the Commissioner's decision is **affirmed**, and judgment will be entered in favor of the Commissioner and against Allen.

**IT IS SO ORDERED.**

**DATED** this 28th day of January, 2008.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT